**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NOMI BEAUTY, INC., <br><br> *Plaintiff*, <br><br> *v.* <br><br> THE ESTEE LAUDER COMPANIES, INC., <br><br> *Defendant*. | Case No. _____ <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

NOMI Beauty, Inc. ("Plaintiff" or "NOMI") brings this Complaint against the Estee Lauder Companies, Inc. ("Defendant," "Lauder," or "ELC"), by and through its undersigned attorneys, alleging as follows:

## NATURE OF THE ACTION

1.      Under the guise of legitimate corporate transactions, the Estee Lauder Companies stole valuable trade secrets and intellectual property from NOMI Beauty, an award-winning, cutting-edge technology company that operated in the beauty and cosmetics industry.  Lauder then used NOMI's trade secrets to its own great benefit, driving literally *billions* in new revenue that Lauder itself attributed to the very innovations that NOMI had pioneered, all without NOMI's knowledge or authorization. This outrageous, predatory corporate behavior is not only actionable in itself, it was also in clear and direct violation of written contractual obligations between NOMI and Lauder. At the same time, Lauder refused to honor its other contractual commitments to NOMI, hobbling valuable partnerships between NOMI and other business partners (for example, hotel chains where NOMI had exclusive contracts to distribute Lauder products).

2.      As a result of Lauder's unlawful, predatory, and inequitable conduct, it stole NOMI's trade secrets, made billions of dollars, and effectively put NOMI out of business.  Through

this action, NOMI seeks to enjoin Lauder's unauthorized and unlawful use of NOMI's trade secrets and other proprietary information, and to recover from Lauder the vast sums by which it was unjustly enriched at NOMI's expense.

3.      In the mid-to-late 2010s, Lauder knew it needed to modernize the way in which it engaged with consumers and collected market data to remain competitive. NOMI was the disruptive technology company Lauder recognized would help bring it into the modern age. Only a short time before the parties' initial interactions (and likely known to Lauder as a reason to target NOMI), NOMI was recognized as the winner of Microsoft's "Best Start-up" Award, as a foremost disrupter in the emerging digital marketing landscape for the cosmetics industry—exactly what Lauder needed not to be surpassed by its competition.

4.      Lauder entered into multiple contracts with NOMI with the promise of a "staged approach" to developing their relationship and integration. Each agreement contained robust confidentiality provisions that protected NOMI's proprietary information, going so far as to recognize that Lauder's use of that information for anything other than its deals with NOMI would represent a form of unlawful and "unfair competition."  But in the end, rather than pay NOMI for its trade secrets, Lauder simply stole them and presented them to the world as its own.

5.      NOMI is an early-stage, innovative technology company that identified novel ways to collect consumer-level data in the cosmetics industry. NOMI's proprietary system architecture and trade secrets allowed NOMI to find the most effective ways to collect usable, granular data to build consumer profiles. The profiles could both stand alone or be integrated into NOMI's propriety, mixed-reality "omni-channel." NOMI identified how to overcome difficult problems in collecting usable and accurate consumer data in the cosmetics industry, such as how to determine consumers' "actual" preferences (as distinct from their "stated" preferences that Lauder and all

other cosmetics companies were then relying upon), which is the critically necessary ingredient to dramatically amplify the sales revenues such otherwise illusory data collection is intended to generate. NOMI had developed the "secret sauce" previously unknown and unavailable to the cosmetics marketing industry, as well as how to uniquely (through its proprietary technological innovations) integrate such new and novel data collection methods into its omni-channel. NOMI understood that the inferences and analysis run on consumer data is only as good as the data itself.

6.      When NOMI and Lauder first started working together, a senior Lauder executive was so ignorant about data analytics that he earnestly asked in early 2018, "What can data do for a large company?" NOMI then spent years educating Lauder about specific applications of its trade secrets to unlock the potential of data to revolutionize how Lauder engaged with consumers. For example, NOMI showed Lauder how to "target incoming international travelers to promote on demand, in room or airport pick up," and dramatically expand the consumer base for "duty free retail" and explained that Lauder could use "China [as] a sampling program to support your duty free stores." After Lauder stole NOMI's trade secrets, that very same executive publicly claimed a few years later that he was the one who "was early to recognize the opportunity in marketing to the Chinese travelling consumer globally as well as seizing upon the online pre-tail opportunity to unlock growth." Despite his early ignorance, he claimed he was responsible for leading Lauder's developments in "business intelligence and analytics."

7.      Following its theft, misappropriation, and unauthorized replication of NOMI's trade secrets, Lauder launched new programs in the United States, China, the United Kingdom, Costa Rica, Malaysia (and possibly even more as yet to be determined countries) that all rely on the very same trade secrets NOMI had been educating Lauder about for years.  Lauder even used NOMI's own words in promoting them. Lauder announced that it was changing its focus to an "omni-

channel mindset" and using new ways to collect data from consumers, including through "pop-ups" at luxury hotels and "high-touch services" designed to collect and build "consumer profiles" through personal engagement with beauty advisors. Each of these phrases was lifted verbatim from the materials that NOMI had provided to Lauder as part of their partnership, and Lauder well knew that it was not permitted to use NOMI's trade secrets outside of that partnership.

8.      Separate from NOMI's proprietary data collection innovations, Lauder also stole NOMI's consumer retail processing inventions. For example, NOMI's system architecture contained different "feature sets" to allow consumers to coordinate their shopping experience. NOMI called one such feature set, which was also a standalone platform and product, "Social Share." Social Share allowed current or potential consumers to share a link across multiple channels that invited new users to shop with NOMI. Once the new user was registered, Social Share aligned the new consumer's account to the original consumer.  Another feature set allowed NOMI to split the payment within a consumer's electronic shopping cart so that each friend or family member could pay for their own order, and allowed NOMI to collect valuable consumer data on each individual separately.  NOMI's feature sets had broad applicability, including in travel retail, whereby a single traveler at a duty-free outlet could legally acquire goods for multiple friends and family that were not travelling with them.  Lauder created a nearly identical copycat program that it also launched in duty-free locations with these feature sets.  Even the name of Lauder's program was a rip-off: "Social Circle."

9.      Lauder also purposefully, and with the willful intention to do harm, breached a supply contract that NOMI relied on to market a bespoke collection of Lauder products within hotels—a collection which had been carefully curated and selected by NOMI for maximum sales success. Lauder had given NOMI the right to design exclusive kits or sets of Lauder products that

NOMI tailored to travelers, which NOMI would then sell directly to hotel guests through NOMI's hotel partnerships. But rather than deliver the product kits to NOMI as required, Lauder deprived NOMI of the products and instead sold the very same exclusive products through other outlets. That is, despite an agreement to partner with NOMI, Lauder breached the parties' agreement and competed directly against NOMI instead. Lauder had by that point obtained the trade secrets it needed from NOMI, and so the time had come to cut NOMI off completely.

10.    Through this action, NOMI seeks to hold Lauder responsible for its breaches of contracts with NOMI, theft of NOMI's trade secrets, unfair competition, and other unlawful, predatory, and willful misconduct and behavior.

## THE PARTIES

11.    Plaintiff NOMI Beauty, Inc. ("NOMI"), is a corporation that is incorporated in Delaware with its principal place of business in New York.

12.    Defendant The Estee Lauder Companies, Inc. ("Lauder" or "ELC"), is a corporation that is incorporated in Delaware with its principal place of business in New York.

## JURISDICTION AND VENUE

13.    The Court has subject matter jurisdiction over NOMI's claims under 28 U.S.C. § 1331 (federal question jurisdiction), because NOMI brings claims under 18 U.S.C. § 1836(b)(1) (the Defend Trade Secrets Act or "DTSA").  The Court has supplemental jurisdiction over NOMI's state law claims.

14.    Venue is proper in this Court because NOMI is incorporated in Delaware and has its principal place of business in New York County, New York, and because Lauder likewise is incorporated in and has its principal place of business in New York County, New York.

15.     Venue is also proper in this Court because two of the operative contracts between the parties—the 2018 Confidentiality Agreement and the 2020 Supply Agreement, discussed below—contain New York choice of law provisions. Additionally, the parties' 2020 Supply Agreement specifies that the United States District Court for the Southern District of New York is a proper venue for disputes arising from the contract.

## FACTUAL ALLEGATIONS

A.     NOMI—a New Tech Innovator in the Beauty Industry

16.     NOMI is an early-stage technology company, originally doing business under the name Gloss and Glam but incorporated under the name NOMI Beauty in 2016, that focuses on innovations in marketing, revenue expansion, and other technologically-enhanced breakthrough improvements in the cosmetics industry. Many of NOMI's trade secrets and technological innovations are readily transferable to use in other industries and retail settings.

17.     NOMI is a small, nimble company, which has found a niche in the saturated cosmetics industry by investing in specialized data-driven services and solutions that set it apart from other companies. The name "NOMI" derives from the company's focus on data—to get to "know me (the customer)."

18.     NOMI and its founders, Nicole Robinson and Jeremy Linder, have received acclaim as pioneers in the Beauty Tech industry, such as winning the "Best Startup" award at the 2015 Angel Week event hosted by Microsoft (NOMI was then doing business under the name Gloss and Glam). In 2017, NOMI was identified in the J. Watler Thompson Future 100 List. In 2020, NOMI was recognized in CB Insights alongside Amazon and Loreal as changing the world of beauty. NOMI has also garnered favorable press for its innovations in outlets like the New York Times,

Forbes, Women's Wear Daily, and other newspapers and cosmetics industry publications, including internationally, such as in Vogue Brazil.

19.    The cosmetics industry is highly competitive and features products that are easily substitutable among brands, meaning that marketing, customer data, and distribution channels are particularly important. Consequently, a major part of the value of a company like NOMI is the competitive advantage NOMI brings through its unique methods for collecting and using consumer-level data to market and distribute products and services.

20.    Early on, NOMI realized that the cosmetics industry needed to rapidly transform into a highly data-driven field. A single customer's data (including contact information, revealed product preferences, purchasing history, and connections to other potential customers) can be worth hundreds or even thousands of dollars, but customers are often hesitant to share their data, especially with traditional retail stores. NOMI developed innovative ways to gather large quantities of high-quality, specific, and wide-ranging customer data from cosmetics customers. In parallel, NOMI developed a technology platform, or system architecture, that allows NOMI to use the zero- and first-person consumer data[1] that NOMI collected to build profiles about individual clients. This gave NOMI powerful insights into the consumer's revealed preferences, demographics, and habits, and allows NOMI to track customers' behaviors and preferences over long spans of time, through many different retail channels and locations, and continue to sell and market to these consumers.

---

[1]    In the context of data analytics, zero-party data is information that users intentionally and voluntarily share with a company, *expecting* that the data will be shared with the company (e.g., data shared through quizzes, polls, surveys, or preference data provided directly by users)—and is general considered the "holy grail" of consumer data in terms of value, utility, and reliability. *See* https://usercentrics.com/knowledge-hub/zero-first-and-third-party-data/. First-party data is observational/behavioral information that a company collects from its customers, (e.g., records of customer purchases, mobile app usage data, website analytics like page views, click patterns, and session duration), and is also highly valuable. *Id.*

21.     Along the way, NOMI solved numerous difficult and novel issues that prevented others in the cosmetics industry from obtaining useful, granular data about consumers. For example, NOMI's initial focus for collecting and aggregating consumer data was through the provision of services to hotel guests, whereby NOMI would partner with hotels to supplant, create, or replace the hotel's spa by providing convenient in-room treatments and consultations, as well as through "pop-ups" (temporary spaces set up in well-traveled locations such as hotel lobbies, where guests could receive free makeup services and try out new cosmetics products). NOMI's hotel model was simply the first use of its platform, which was engineered to be flexible and used in a variety of contexts, such as in department stores, free-standing stores, and duty-free stores as well.

22.     NOMI designed each interaction with consumers to acquire high-level data using its proprietary methods, such as through carefully designed surveys that both the customer and the stylist would separately complete. NOMI could analyze and compare the user-provided and stylist-provided data to determine the most accurate preferences for that user, which would be used to compile the user profile. This gave NOMI different insights about its consumers that could not be obtained from typical website or email interactions.

23.     NOMI also researched different markets, such as China, which has a lucrative and burgeoning cosmetics market, to identify growth opportunities beyond the hotel context specifically. For example, NOMI identified a widespread social practice in China wherein family and friends of a business traveler would request that the traveler purchase for them a large number of beauty products at a duty-free shop while traveling, in order to avoid taxes. Such luxury duty-free shops are increasingly common in airports, upscale hotels, and malls.

24.     The feature sets that NOMI developed within its system architecture were ideally suited to address the need of travel retail (also known as duty-free) consumers in China and

elsewhere who looked to participate in their shopping experience together with their family and friends. Specific feature sets that NOMI developed included an "Exploratory Cart" and "split payments" that would allow retailers to accept separate payments from groups of customers while maintaining NOMI's ability to differentiate purchases and still build individualized profiles and dramatically increase sales. Another feature set, referred to by NOMI as "Social Share," allowed consumers to share promotions with their friends and family and thereby receive credit on their own account.

25.     NOMI initially developed these features in the context of its hotel partnerships, where multiple clients might book spa or makeup services through one room or client bill, such as for a bridal party or corporate event. But NOMI quickly identified multiple other applications for its trade secrets and business strategies, including in the sale of cosmetics to travelers, who could leverage NOMI's feature sets to coordinate their shopping and conveniently pick up products at the duty-free store, a cosmetics vending machine, or other retail locations. As NOMI later explained to Lauder on condition of confidentiality (without limitation, pursuant to a written contract), this unique duty-free travel business plan provided customers with a new way to purchase duty-free. It both allowed for duty-free preorders by travelers (*e.g.*, a wife can place her order while or before her husband is traveling on business) and allowed for convenient "split payments" whereby different family members and friends can shop and pay under one account.

26.     In addition to such platforms and marketing systems, NOMI also created proprietary software that facilitated direct-to-client beauty services, such as haircare services, makeup application, and skincare consultations. NOMI's scheduling software optimized the scheduling of stylist meetings with customers in real time, and tapped into the unique market of hotel guests to offer salon services for travelers on the go. NOMI focused initially on hotels to

aggregate and funnel luxury beauty customers because the department store retail model was dying, and companies like Lauder were struggling to find and retain their customers.

27.    NOMI also used these in-person stylist visits as an opportunity to obtain customer data in a novel way; by training its stylists to not only act as beauty advisors, but to also subtly gain intelligence about customers' consumption preferences via casual conversations. For example, NOMI trained stylists to ask customers about where they currently buy beauty products, how frequently they travel, preferred products and shades, and skincare concerns. Stylists were trained to carefully log such preferences, and NOMI would then track and translate that information into useful data, through a proprietary system architecture that contributes to the customer's data profile.

28.    NOMI's platform also offered customers a way of engaging with NOMI and its services and products through multiple different ways, through what NOMI later called a mixed-reality "omni channel." These multiple touch-points with customers allowed for the sale of products and services (and the collection of customer data) in hotel rooms, duty-free locations, airports, retail locations, spas, and pop-ups. This data allowed NOMI to not only know where its customers were, but how and when to best target them.

29.    NOMI realized that luxury hotels offered an untapped channel for acquiring customers and distributing high-priced beauty and skincare products. Such hotels traditionally offered guests a small variety of complimentary products in-room, such as shampoo, conditioner, lotion, and makeup remover. NOMI identified untapped demand for a wider variety of skincare and cosmetic products to be sold within hotel rooms (also known as "mini bar" retail), where guests and travelers are often willing to pay a premium for the convenience of using products already available within their rooms. NOMI also realized that there was untapped potential for data

acquisition and utilization in this context, as historically hotels had not been collecting any useful trackable customer data on such in-room purchases.

30.     NOMI developed a novel and proprietary platform specifically designed for use in hotels, to streamline the distribution channel for cosmetics skincare and haircare products, both for in-room purchases and at duty-free shopping locations (which are often found in the lobbies of luxury hotels). This platform involved a combination of NOMI's unique proprietary technologies, as well as NOMI's selection and application of specific software and services from its trusted vendors. As a key component of NOMI's business model, NOMI would offer hotels free access to its valuable technology platform, in exchange for the exclusive right to distribute beauty products and services in that hotel. While this platform was capable of standing on its own, one of the ways in which NOMI made it possible to exchange information with its hotel partners was to develop methods to integrate its systems with the Oracle-based hotel systems, thus facilitating the acquisition of consumer data while ensuring smooth payment processing.

31.     Another proprietary technology that NOMI developed was the Leo Box, a piece of physical hardware that utilized NOMI's preferred software, which could be placed in a hotel to facilitate real-time payments and purchase tracking for on-demand room services, in-room purchases, and tracking and collection of customer data, and storage of all such information on the cloud. The Leo Box is an example of the methods NOMI developed which not only functioned as a standalone technology, but also allowed for smooth integration between NOMI's software and the hotel partners' standardized management software (Oracle), allowing these two distinct systems to communicate—providing a significant convenience and incentive that NOMI used to lure in new hotel partners.

32.     NOMI also integrated its hotel-based model into its Omni Channel model, offering customers a variety of different brand touchpoints, and a variety of different methods by which NOMI could collect data. For example, prior to a hotel guest's arrival, NOMI would send the guest highly targeted pre-arrival marketing emails (NOMI also developed plans to make these marketing emails even more targeted, including customization for customers based upon their country of origin, room type, demographics, and spending habits). NOMI could offer guests multiple methods to purchase and pay for its products and services (*e.g.*, online purchases, on-demand services via an app, shipping to customer's home address, and charging payments to a customer's hotel account or prepaying).

33.     Using this model, hotels quickly realized the value of NOMI's offerings. NOMI acquired exclusive rights to distribute beauty and cosmetic products at over 40 leading luxury hotels in New York and Miami, such as IHG, Highgate, Hilton, Marriott, and Four Seasons. At the height of its success, NOMI maintained exclusive partnerships with nearly every major hotel chain in New York City.

34.     In each case, NOMI employed a standard operating agreement with its hotel partners, which contained several terms designed to protect NOMI's business and shield its trade secrets from disclosure. For example, these hotel contracts contained non-compete agreements, which meant that NOMI would be the hotel's exclusive beauty provider, and that if the hotels were to cease doing business with NOMI, the hotel would be restricted from doing business with any of NOMI's competitors for a full year. These contracts also contained confidentiality provisions ensuring that NOMI had sole ownership of all data collected and that the hotels could not disclose NOMI's trade secrets.

35.    NOMI's hotel-based business model had the potential to be impressively profitable—it maintained very low operating costs (for example, it had no real estate costs), had evergreen access to a largely untapped segment of the cosmetics market (in-room sales of high-end cosmetics to luxury hotel guests), and had a highly scalable and adaptable business model. By 2022, NOMI had generated thousands of unique customer data profiles (sourcing data from stylist appointments, hotel room sales, and pop-up sales), which encompassed hundreds of thousands of individual data points.

36.    As NOMI expanded, it also worked closely with key players in the hotel industry to enable NOMI's software platform to be adapted to and integrated with the databases of third parties. These relationships, which were often difficult to obtain and required several years of integration testing before completion, put NOMI into a prime position to launch new programs or to expand to additional hotel chains worldwide.

37.    In the below illustrations, NOMI summarized how its unique and novel business ideas and trade secrets worked together. NOMI integrated data from different sources to create an Omni Channel with a foundation based on consumer profiles:



## Model And Systems

NOMI

Large beauty brands won't sell goods without a fully integrated EDI software to get weekly tracking. Hotel key software systems are on DOS. NOMI built the only software that connects all systems.

**Duty Free**
Future

**Group Purchase Orders via EDI**

**NOMI's Platform:**
Tracking & Transmitting
Connecting Leo to
Roja System
EDI System
Hoarding User- Profiles
Post Purchase Data-
For Omni Channel

**Exclusive Rights**

**Beauty Brands**

**Products: We hold no outside inventory**

**OMNI**

Tracking User Data, Exc. Rights.

**Software:**
Platform
Oracle.
Integration
Open API
StandAlone
**Hardware:**
LEO Box

**Hotels**

NOMI is the ONLY company with this software. The barrier to entry due to Oracle would be 5+ years.

© Copyright 2020 | All Rights Reserved                The contents are confidential and are not to be reproduced without express written consent

## Technology Platform NOMI



- □ Leo Box creates trackable software, integrates into 100% of hotels, skips AWS and can create targeted marketing towards women.
- □ 2 Web portals (consumer / concierge); 2 Apps (consumer / stylist)
- □ Robust back-end
- □ A.I. that reduce work force management by 60%
- □ Database automates all 3 parts:

  1. Consumer preferences, consumer self reporting data,
  2. Stylist reporting data, and – 92% accuracy
  3. User surveys.



® Copyright 2019 | All Rights Reserved                The contents are confidential and are not to be reproduced without express written consent



B.    Summary of NOMI's Trade Secrets

38.    NOMI's trade secrets at issue in this lawsuit include, but are not limited to:

a.    NOMI's system architecture. This trade secret encompasses the NOMI platform's unique, proprietary combination of system architecture, user interface, software/underlying source code and algorithms (both those that were custom-built in house by NOMI and those that NOMI sourced/combined/adapted from existing third-party services), user-facing design, and overall operations. The architecture NOMI designed allowed for multiple unique points of data collection from beauty customers (gathered via in-person appointments, pop-ups, tracking of in-room hotel purchases, NOMI's apps and online platforms, customer questionaries, etc.); stored and aggregated that data in a useful way; provided data insights and noted buying trends for individual consumers and groups of consumers; made recommendations

for new ways to target these consumers; and allowed for ways to export and use this data by third parties (such as hotel business partners).

b.  Split payments. NOMI developed the idea and methods for a "payment project" involving an "exploratory cart" that would allow retailers to accept split payments from groups of customers, including in the duty-free context. The Exploratory Cart also allows each consumer to have their own sub-cart within another member's cart. Apart from facilitating payments, NOMI designed methods for how to collect individualized data from multiple consumers in a group purchase context.

c.  Travel retail business strategy. NOMI developed proprietary business strategies for targeting international travelers at duty-free locations, including in China. NOMI's strategy involved leveraging pop-up retail sales and stylist appointments at duty-free locations (e.g., luxury hotels and airports), using NOMI's proprietary scheduling software to maximize the number of appointments in a given day, and using such sales and appointments to collect consumer data and build consumer profiles via NOMI's system architecture, and then repurpose that data to support further sales.

d.  NOMI's exclusive and customized kits or bundles of cosmetics products. NOMI designed a specific collection of cosmetics products tailored to the needs of travelers based on research into consumer preferences. The selection of which products to bundle together consisted of NOMI trade secrets.

e.  Proprietary methods for zero- and first-person consumer data collection, which could then be used to build consumer profiles that did not exist in the beauty industry. NOMI developed methods for using in-person stylist visits (e.g., bridal

makeup appointments, pop-up appointments in hotels) to covertly gather data about customers' consumption preferences via casual conversations. NOMI also designed customer surveys and questionnaires that used specific techniques that NOMI determined were the most effective ways to capture accurate reflections of a consumer's true preferences. NOMI then determined how to log, translate, and track that data in a useable format, to be reused in retail stores and other locations.

f.   The NOMI omni-channel. NOMI designed a multi-channel cosmetics platform offering customers multiple ways of engaging with NOMI and its services—and multiple avenues for NOMI to collect consumer data and sell products. For example, NOMI offered on-demand makeup appointments at hotels, pop-up appointments in duty-free locations like airports or hotel lobbies, curated mini-bar products for purchase inside of hotel rooms, and online portals/apps for purchases and appointment scheduling.

g.   Consumer data from in-room hotel purchases. NOMI used its proprietary platform to track in-room purchases by hotel guests, and to collect, aggregate, and sort this data into useful trackable metrics. This platform also streamlined the distribution and product inventory tracking processes. As part of its core business model, NOMI offered hotels access to this platform for free in exchange for the exclusive rights to distribute beauty products in that hotel.

h.   Additionally, the entire bundle of concepts and ideas that went into NOMI's unique platform cumulatively, or in some combinations, constitute novel and protectable trade secrets. In other words, NOMI's trade secrets were the unique combination of its system architecture, software, design, methods of data collection, storing, and

aggregation, omni-channel system, exclusive cosmetics kits, split payments plan, and travel retail business plan—the way in which NOMI's various tech and business components fit together as building blocks to form a unique whole.

C.    Lauder Needed NOMI's Innovations

39.    Lauder is a ~$29 billion dollar multinational corporation, founded in 1946, that sells makeup, skincare, perfume, and hair care products, among other things.

40.    In contrast to NOMI, when the parties began working together in 2018, Lauder's business model was heavily reliant on traditional product distribution networks, such as physical retail locations in department stores, which could not utilize customer data or employ novel beauty technology in the way that NOMI could.

41.    Lauder is currently the second-largest cosmetics company in the world, and owns a diverse portfolio of well-known cosmetics brands, including La Mer, Bobbi Brown Cosmetics, Clinique, Too Faced, Dr. Jart+, and Tom Ford Beauty.

42.    Such brand acquisitions are a key part of Lauder's business, allowing it to maintain relevance and growth in the modern era. Since the early 2000's, Lauder has shown a pattern of acquiring (or entering into licensing deals with) new, trendy, valuable cosmetics brands every few years. Lauder has a significant business development plan built around acquiring such companies and their novel, valuable intellectual property—such as marketing and distribution channels.

43.    In line with Lauder's history of acquiring smaller cosmetics brands to stay relevant, Lauder saw an opportunity in NOMI to acquire innovations that would allow Lauder to stay competitive in a rapidly changing industry environment. Lauder enticed NOMI into divulging its intellectual property and trade secrets to explore a long-term partnership or acquisition. But the

reality was that Lauder simply mined NOMI's valuable assets, and once it learned enough, cut NOMI loose.

      D.    <u>NOMI and Lauder's Partnership—the Beginnings</u>

          1.    NOMI Shares Valuable Information With Lauder as Part of a Potential Acquisition, All Subject to a Confidentiality Agreement.

44.    NOMI and Lauder first connected in February 2018. At the time, the parties' discussions centered around Lauder's potential acquisition of NOMI—proof that Lauder knew from the companies' very first interactions how valuable NOMI's intellectual property and trade secrets were.

45.    Negotiations between the two companies were productive at first, and in April 2018 the companies entered into a non-disclosure agreement (referred to in this Complaint as "the 2018 Confidentiality Agreement") and began the due diligence process in preparation for a potential transaction.

46.    When NOMI and Lauder first began working together, Lauder was woefully behind in its understanding of how to collect and leverage useful zero- and first-person consumer data and the lucrative possibilities such data presented. NOMI offered Lauder invaluable education about its technology and business strategies, and until NOMI's involvement, Lauder did not understand even the basics of how consumer data could be used to drive revenue.

47.    Indeed, at the conclusion of one of the parties' earliest meetings (in April 2018), Lauder executive Olivier Bottrie asked NOMI—out of genuine ignorance, and not rhetorically— "What can data do for a large company?"

48.    As the parties' discussions progressed, it became clear that a partnership with NOMI would offer Lauder several much-needed benefits, including: insights into how to operationalize data collection and utilization, novel methods of gaining new customers from unique customer

segments (*e.g.*, pop-up customers, in-room hotel purchases), highly valuable channels of consumer-level data collection and aggregation, and more intimate and long-term relationships with those customers (both in physical and virtual retail spaces). Additionally, Lauder discussed how, post-acquisition, NOMI's founders would be tasked with creating a new department within Lauder that would create new ways to gather and centralize the data for all of Lauder's brands.

49.    NOMI provided Lauder with a detailed written answer to the question of how to leverage customer data, for example, explaining how NOMI's partnerships with hotels allowed NOMI to both provide on-demand hair and makeup services while using these appointments to collect data and create consumer profiles. Then, with the consumer profiles, NOMI leveraged exclusive distributor agreements whereby NOMI would offer hotels access to its valuable software platforms for free, in exchange for the exclusive right to distribute beauty products in that hotel.

50.    NOMI also explained in detail how it could leverage this new approach for Lauder if Lauder were to acquire NOMI. For example, NOMI explained that Lauer could "repurpose NOMI's data systems across all physical [retail] locations to start collecting all consumer data" such as "purchase habits, product preferences, and shade [choices]" in order to "increase sales online by up to 35% and drive countless sales into stores." NOMI explained to Lauder when, where, and how to identify and collect useful consumer data. This removed the guesswork, research, and experimentation Lauder would have needed to do, absent NOMI's assistance, to design and streamline the right kind of systems for collecting useful data. Stated differently, NOMI described to Lauder the best places and methods for gathering data and where to focus Lauder's attention when building its infrastructure for consumer-level data analytics.

51.    NOMI's unique insights, platform, and systems architecture was developed over years of effort by its engineering, product, and strategy teams. But NOMI felt secure disclosing its

valuable trade secrets to Lauder because the relationship was governed by the terms of the parties' confidentiality agreement. NOMI's communications with Lauder regularly emphasized the importance of confidentiality and secrecy in the parties' communications. For example, in April 2018 (prior to the execution of the 2018 Confidentiality Agreement), Ms. Robinson said that NOMI would send Lauder "the decks and all other requested information once the NDA is received."

52.    The 2018 Confidentiality Agreement provided that Lauder "agrees to keep all" materials provided by NOMI in connection with the merger talks "confidential and to take commercially reasonable steps to ensure that all of its affiliates . . . also keep such [material] confidential." Conf. Agmt. § 1. Lauder agreed to "maintain in strict confidence . . . the nature, extent, terms, and status of [the] negotiations and discussions" between the parties, and to not "discuss [or] disclose" any of the confidential materials "except with the prior written approval of each of [NOMI] and [Lauder]." *Id*.

53.    The 2018 Confidentiality Agreement further provided that Lauder "agrees to use" NOMI's confidential materials "solely for the purpose of evaluating a possible Transaction between" the parties, and that it "shall not disseminate or disclose" the materials to any person other than those "who need to know such information for the purpose of evaluating a possible Transaction between the parties." *Id*. § 2. Moreover, NOMI's confidential materials were to "remain the sole and exclusive property" of NOMI and "no right or interest therein is transferred by virtue of this Agreement, except for the limited right to use such [materials] in connection with a possible Transaction." *Id*. § 3. The parties also agreed that "the confidentiality obligations set forth in this Agreement shall survive indefinitely." *Id*. § 5.

54.     Thus, the 2018 Confidentiality Agreement made clear that Lauder was prohibited from using NOMI's confidential materials for any purpose other than evaluating the potential acquisition.

55.     Protected by this agreement, in May 2018 and onwards NOMI continued to freely disclose its trade secrets, as well as other innovations, to Lauder, trusting in the protections of the Confidentiality Agreement. For example, in an email exchange in May 2018, Ms. Robinson shared with Lauder valuable information about cosmetic product testing in hotel suites, and Ms. Robinson specifically asked Lauder to "please treat the above information as highly confidential." In another example, in an email exchange during August 2018, Ms. Robinson specifically asked Lauder personnel if the information that she is sharing with them about NOMI is "covered under our NDA"—and Lauder personnel respond that "yes this is covered under the NDA."

56.     Lauder made intensive demands for information from NOMI about its proprietary technology as part of the due diligence contemplated by the 2018 Confidentiality Agreement. For example, on May 4, 2018, Lauder made an extensive due diligence request, seeking detailed information regarding NOMI's business strategies, confidential and proprietary data, and system architecture, such as:

a.  Customer information: "Customer acquisition process and costs over time", "Average customer spend by type (services vs. products) over time", "Customer demographics", "Representative data collected for each customer"

b.  Data management: "Data security protocols", "Overview of data management vis a vis hotel partners", "Current customer data utilization (e.g., targeted direct marketing, customer segmentation, etc.)", "Data collection, management and ownership", "Restrictions on data utilization"

    c.   <u>Stylist management and strategies</u>: "current stylist and workforce arrangements", "representative terms of employment and compensation structure", "Stylist training / retention strategy", "Overview of stylist management protocols"

    d.   <u>System Architecture</u>: "Detail regarding proprietary technology capabilities", "Detail regarding technology-enabled capabilities", "CRM, appointment booking, stylist management, product acquisition, etc.", "Built vs. acquired / licensed technology IP", "Technology implementation process and costs"

    e.   <u>Business strategy and ideas</u>: "Scalability of technology platform", "Investment requirements for expansion of current business per existing business plan", "Target markets and selection process / criteria", "Priority target markets" (including "Demographics", "Geographies", "Investments required to enter a new market"), "Target partnership accounts key to realizing current business plan", "Overview and status of planned product / service introductions and associated capital requirements", "Overview of pricing strategy", "Assessment of competitive landscape and positioning"

57.    As another example, in June 2018, Lauder requested a "deep dive" into how Lauder might utilize NOMI's proprietary technologies to create its own distribution channels for cosmetics products.

58.    From 2018 through the end of their relationship, NOMI provided information responsive to Lauder's due diligence requests. This included exchanges of documents and emails detailing NOMI's system architecture and strategies, and much of the data-sharing occurred during in-person and telephonic meetings. For example, in one text exchange between Ms. Robinson and a Lauder employee, Ms. Robinson stated that the "tech scope meeting" was a "great meeting" and

that the parties should follow up soon on various topics like "increasing customer awareness via appointments," "mini bar sales," and "other retail channels." The Lauder employee agreed and stated that they should schedule a further meeting with the "tech team" to discuss "logistics and .com interface." As another example, meeting agenda notes between NOMI and Lauder show that the parties met to discuss matters like "Oracle beauty integration," "free software for non-technical minbars," "flexible testing fields," and "global ELC overlap discussion."

59.    Through the course of numerous in-person meetings, phone calls, and conferences over a multi-year period, NOMI disclosed its valuable trade secrets to Lauder, including:

a.    In one 2018 exchange, NOMI explained how their tech system is "completely unique to us," that NOMI's platform is "built in a way that is system agnostic that allows other systems to integrate in over 60% of hotels," which "allows the system to do things like onboard a hotel or a user in one step, which effectively creates a platform that can globally scale with our competitors."

b.    In another 2018 meeting, in which Olivier Bottrie was present, NOMI discussed the details of its hotel distributorship model, including how NOMI acts as a "distribution route into hotels," with hotels buying "amenities directly from NOMI then [selling] the [full-size] products via a dropship led by NOMI" and "pop ups" in hotels. NOMI explained how it is able to collect accurate and actionable first-person data from beauty consumers, who typically falsely report their preferences. NOMI educated Lauder on how to collect information through stylists rather than the stated preferences of the consumer alone. NOMI walked Lauder through its various techniques for gathering the data, such as through visual (rather than text-based) surveys.

24

c. In a meeting on June 4, 2018, in which at least two Lauder employees were present, NOMI discussed selling exclusively Lauder products in hotel rooms and explained how the parties' agreement would allow "the AI component focus" to "run on ecommerce."

d. In a meeting on July 2, 2018, NOMI shared with Lauder details about obtaining "user profile[s] via stylist[s]" and how NOMI can use data to "track age" and "track how behavior changes across product, brand, and life events." Lauder asked questions about "tech as it relates to deploying the stylist," "how [to] leverage partnership with hotel[s]," and "data."

e. In a meeting on July 21, 2018, NOMI discussed their app and online marketing process, optimizing their website, and how work shifts could be "auto assigned" to stylists based on availability.

f. In a meeting on March 11, 2019, NOMI shared with Lauder a flow chart of NOMI's distribution model, which includes various channels for reaching customers, both prior to and after their stylist appointments, as well as "software access" details.

60. NOMI also provided Lauder access to a secure data room that contained confidential information about NOMI's proprietary software and technology. In this data room was, among other documents, a 38-page document titled "NOMI Beauty Technology Platform," wherein NOMI outlined the mechanics of specific features of NOMI's system architecture. The document provided a top-down explanation of the core components of that system, including: the customer booking process; the user web interface; the methods of customer data collection, synthesis, and storage; the data security features relied on to prevent breaches; the "tech emergency procedures" in the case of a system failure, and the scalability of the platform with a mind to future growth. The

document described which functions NOMI relied on for its "custom built" internal systems; and which functions NOMI relied on for third-party or open-source products; as well as providing detailed monthly cost breakdowns of each of these expenses. In the "Data Flow & Storage" section, the document showed a photo of the System Architecture and described the source of the data it collected and outlined the types of information that could be compiled from that data.

61.    The system architecture that NOMI provided Lauder sat at the heart of one of NOMI's core trade secrets. The system architecture, which NOMI built over years of development, research, and testing, provided a roadmap for how to collect useful data from various sources and to aggregate, analyze, and deploy that data for a variety of business use cases. Upon information and belief, Lauder did not have a comparable system architecture of its own to collect, analyze, and build consumer profiles across a range of applications.

62.    Other key documents found in the data room included a detailed description of NOMI's dozens of contractual relationships with its hotel partners; NOMI's business plans for expansions to further cities and hotels; a guide to how NOMI structured its workforce/employment relationships with its beauty stylists (*e.g.*, pay rubrics, employee vetting and training, and a unique scheduling platform); a document comparing/contrasting NOMI against its main competitors in the field; and a document giving a step-by-step review of the user interface (and backend software considerations) for NOMI's stylist guide app.

63.    NOMI also offered Lauder custom considerations for how to approach a build out for surveying and generating customer profiles, which NOMI had been gathering largely via pre-appointment beauty questionnaires, designed to gather a clean, detailed, and complete data set from a customer. The insights and strategies NOMI provided Lauder constituted additional trade secrets and confidential business strategies. This included advocating the use of specific kinds of visual

questioning—meaning, questions based on prompts with pictures rather than words—and a dynamic approach to questioning (one that adapts to the user to provide higher-value questions) and recommending a live-modifiable version of the questionnaire (allowing iterations to be made more quickly). NOMI arrived at these conclusions only after moving the proprietary system architecture through several iterations, developing and testing each method before arriving at what NOMI considered optimal organizing principles.

64.     Throughout their time working together, NOMI and Lauder personnel were frequently holding lengthy, in-depth meetings to discuss NOMI's proprietary technologies and how those technologies might be used by Lauder. For example, in July 2018, Lauder asked for details about several aspects of NOMI's business, such as "service marginal profit," "certification costs," "average repeat rate (over the last 6 months) for Nomi customers," and "labor costs." NOMI responded with an in-depth review of all the requested information and more—such as a novel idea to "target wedding guests through the bridal couples' websites" which would "direct the wedding guests to book Nomi services" and be "incentivized through a free makeup appointment," a new "stylist app" that "could be re-usable in other networks" by "link[ing] any on-demand artist to a retail plugin that allows them to join a direct to consumer marketing channel," and detailed information about profit margins associated with traveling makeup artists, tip ratios, and hourly charges.

65.     As a further example, also in June and July 2018, Lauder expressed interest in NOMI's proposal for a "shared MAC workforce" wherein "NOMI and Lauder will provide and compare data around workforce utilization, NOMI appointments and MAC store workflow" in order to "prove" that NOMI's system works.  NOMI's concepts and strategies were attractive to ELC, which had underutilized stylists in their MAC stores. NOMI explained how ELC could use

these stylists to both solve their idle work force problem while also developing actionable user profiles.

> 2. NOMI Continues to Share Trade Secrets and Proprietary Information With Lauder In Connection With a Potential Investment by Lauder.

66. In June 2018, after receiving significant due diligence documents from NOMI, including NOMI's trade secrets and other intellectual property, the parties' discussions moved from a potential acquisition by Lauder to a potential direct investment. That is, while a complete acquisition was still an eventual possibility, the parties' focus turned to a direct equity investment by Lauder into NOMI. The parties accordingly drafted a term sheet, under which Lauder would invest $15 million into NOMI—implying a $45 million enterprise valuation at the time.

67. Throughout 2018 and 2019, NOMI continued to regularly provide Lauder with detailed data and business plans, at Lauder's request, and pursuant to the 2018 Confidentiality Agreement. Alongside the technical documentation, NOMI provided Lauder, at Lauder's request, presentation decks that included specific applications of its system architecture and explanations for when and how to collect consumer data. This information-sharing was both in furtherance of the potential investment by Lauder into NOMI, and as part of the parties' ongoing discussions about an operating partnership and Lauder's eventual acquisition of NOMI and integration of its operations—and trade secrets and intellectual property—into Lauder's business.

68. NOMI also worked closely with Lauder executives, such as its then-Vice President for Strategy, New Business Development, and Analytics. NOMI explained how stylists should "collect certain data from the customer" "both conversationally and based on product used," including with reference to the form of specific questions that should be used. The information learned from the customer would be fed into a live database that could then provide the stylist with immediate recommendations.

69.     This type of data collection and alternative distribution channel was new to the beauty industry when NOMI developed it. And as described in the Technology Platform deck that NOMI prepared for Lauder, there were innumerable ways in which both data warehousing and a live database could be used to generate recommendations on a customer-specific level, such as by reporting recommendations "back to the live system for use on the website, in re-engagement emails or even dynamic, user-specific advertising."

70.     NOMI also shared with Lauder detailed information about the logistics of its hotel partnerships and collection of data from hotel customers, such as which vendors NOMI employs for inventory management, for ecommerce, for warehousing, and for deliveries; the variety of checkpoints for "free marketing" within hotels (such as keycard paper inserts, hotel confirmation emails, door hangers, and elevator screens); and the wide variety of methods by which customers could engage with NOMI products in hotels (via stylist appointments, in-room products that are refilled by housekeeping staff, or home delivery). NOMI specifically noted that "this data is not available to anyone else"—NOMI was sharing it exclusively with Lauder in hopes of furthering the parties' business relationship.

71.     While the parties worked together on data sharing and the exclusive hotel partnership, they also continued to discuss other business partnership opportunities. Throughout Spring 2019, for example, NOMI discussed with Lauder the possibility of expanding its platform deeper into duty-free and the need to bring NOMI's system architecture and Omni Channel to China. NOMI repeatedly emphasized to Lauder how lucrative it would be for Lauder to use NOMI's system architecture for building consumer profiles in the context of the China duty-free market—and provided Lauder with detailed proprietary roadmaps on how to effectuate such an expansion.

72.     For example, in a message to a Lauder employee in February 2019, Ms. Robinson stated that NOMI has "spent the last year building out" its duty-free program, and that NOMI had multiple airports ready to participate as duty-free partner locations. In another message in February 2019, Ms. Robinson extolled the benefits of a duty-free expansion for Lauder: because a duty-free location is frequented by "tourists [who] are new every day," Lauder could "test ideas and discounts [in] live time," could help funnel duty-free buyers to partner hotels by offering free product delivery to partner hotels, and could use cosmetics vending machines which have "really cheap" operational costs—"duty-free is huge." She informed Lauder that "the cheapest way to get [products] to the guest duty-free is a really cool vending machine in [airport] terminals. We send a signal to the warehouse – the machine holds shopping bags or they shop there. They pick it up on the way home. Boom. One single shopping tax free zone."

73.     In a message to a different Lauder employee in May 2019, Ms. Robinson encouraged Lauder to use "China [as] a sampling program to support your [duty-free] stores," and said that NOMI would be happy to act as the "middle-man and set up all the tech you need for forecasting and grey market prevention." The grey market, or Daigou, in China involves the resale of goods purchased outside mainland China for customers in China to avoid import duties and taxes. NOMI, in other words, was offering Lauder a way to use its data technology to forecast and track potential sales in the grey market. In another message in June 2020, NOMI informed Lauder about its proposed "scalability models" for Lauder "duty-free stores," and asked for details about Lauder's duty-free airport operations.

74.     During discussions about a Lauder-NOMI partnership, NOMI responded to questions about how NOMI's business strategies would "fit into our roll out." Lauder described how NOMI's proposed "In-room retailing" at hotels "looks like an interesting opportunity," and

then asked questions about "execution." Lauder specifically noted the "multiple references to Duty free" in NOMI's explanations of how its technology allowed NOMI to "target incoming international travelers to promote on demand, in room or airport pick up, and duty-free retail." NOMI explained the various customer touch-points that enabled NOMI to sell product to users and how those touch-points would work as a coordinated whole, such as "Stylist On-Hand," "Mini-Bar," "Room Service," "Order On-Demand" (which would include "a website or app"), "Duty Free," among other things. As early as February 2019 NOMI identified that its charge-to-room feature with its hotel partnerships could be repurposed to provide for split payments in travel retail (that is, duty-free).

75.    NOMI also explained how its proprietary software could facilitate this process, explaining in a March 2019 message that NOMI's "software for post appointment sales"—which would allow for sales "on site if the [makeup] artist has it with her" or "delivery on demand the next day"—is "built and hard tested," and that the software can "stand alone or link into" NOMI's proprietary Leo box. NOMI not only instructed Lauder about the individual components of this valuable business plan, but showed Lauder how each of the pieces seamlessly fit together.

76.    During July 2019, NOMI and Lauder engaged in detailed conversations about data exchange between the two companies and how to best "get ELC's technology streamlined with NOMI," and Lauder specifically asked NOMI "what level of data is available in the system you are building."

77.    Based on publicly available statements, Lauder only began to venture into consumer data analytics around the time that Lauder was engaging with NOMI. During its second quarter earnings call in February 2019, Lauder explained that it had made "improvements" "internally in terms of our data analytics" and that Lauder "developed more robust data and are using it to focus

on top priority areas and create highly-desirable products." Similarly, during Lauder's "Investor Day Presentation" on March 6, 2019, Lauder explained that it projected future growth because it was now "harnessing data to enhance personalization and scale the effectiveness of our advertising."

78.    These public statements by Lauder align with Lauder's reaction to what it was learning from NOMI. For example, in a March 7, 2019 email, Lauder explained that it was "very much interested in moving forward with Nomi" and was "very excited about the incredible potential of a ELC/Nomi partnership." Lauder informed NOMI that "we'd ideally like to take a staged approach, beginning with an exclusive partnership in NYC on beauty services and in-room product retailing." On March 18, 2019, Lauder reiterated that the in-room product retailing was "just the first actionable step" in the "nearest term," but that Lauder had "talked [about] everything" that NOMI presented. Lauder led NOMI to believe that following a successful hotel test, Lauder would roll out the business relationship on a larger scale.

79.    Lauder allowed NOMI to believe that the parties were still working towards a broader partnership or investment, but that the "beginning" step was to enter into a supply agreement for distribution of products within hotels. In reality, Lauder proposed a "staged approach" simply to string NOMI along until Lauder had sapped NOMI of its knowledge.

E.    NOMI and Lauder's Formalized Partnership—the Supply Agreement.

80.    As an initial step in the "staged approach" to moving forward with NOMI, in April 2019, Lauder proposed that the parties enter into an exclusive partnership regarding beauty services and in-room retail in hotels. In May 2019, the parties signed a non-binding term sheet, which anticipated an agreement whereby NOMI would become Lauder's exclusive provider of beauty products to luxury hotels. Under the term sheet, Lauder would approve any hotels that NOMI

would partner with; and NOMI would order custom cosmetics kits/bundles from Lauder to sell at those hotels (and such kits would remain proprietary to NOMI). The term sheet also contemplated that Lauder would not terminate the agreement unless NOMI failed to meet a certain annual sales target ("KPI").

81.    In May 2019, Lauder asked NOMI to run a pilot program in the NYC hotel market, selling Lauder products and allowing Lauder to observe the application of NOMI's services and first-party data collection in real time.

82.    In July 2019, Lauder sent NOMI a draft contract (the "2019 Draft Contract") reflecting the terms of the 2019 term sheet. The draft contract specified a KPI of $30 million annually per brand, with approximately 5 to 8 of Lauder's brands working with NOMI. The 2019 Draft Contract also provided NOMI with the right to design and build "digital Brand Boutiques" for Lauder that would allow consumers to purchase Lauder products through NOMI's omnichannel.

83.    Evidencing Lauder's intention to expand into new user experiences, Lauder updated its privacy policies sometime between October 2019 and August 2020 to collect consumer profile data when the consumer "make[s] an appointment."

84.    Because Lauder was still dragging its feet on providing funding for market testing, NOMI decided, in the Fall of 2019, to begin its own market testing. Lauder lacked the capability to perform such valuable analytics, because these relied on NOMI's proprietary platform, which provided real-time inventory tracking for each hotel room.

85.    NOMI's product testing was highly successful and showed double the expected sell-through rate. NOMI presented the results to Lauder on October, 2, 2019, and Lauder was pleased with the results.

86.    Immediately following the successful market testing, the Lauder executive overseeing the merger talks with NOMI left the company. But the parties continued to negotiate the agreement, and in April 2020, Lauder returned with a revised contract offer. In this contract (the "2020 Supply Agreement"), Lauder included a more expansive termination provision, allowing it to terminate the relationship for any reason whatsoever with 6 months' notice (instead of tying termination to NOMI's failure to meet KPI's, as in prior versions of the contract). Given the substantial investment NOMI had made in its partnership with Lauder, and the belief—based on Lauder's own statements—that this was an initial step in the staged approach to their relationship, NOMI signed the contract in early May 2020, with an effective date of April 24, 2020.

87.    The 2020 Supply Agreement provided that the parties shall "mutually agree upon each individual hotel location" where Lauder's products would be sold; that NOMI "shall present the Brand to each such hotel operator for its consideration"; and that if a hotel operator agrees to sell Lauder products NOMI shall handle such sales. Supply Agmt. § 2. It further provided that NOMI "shall have the exclusive right to supply [Lauder] products to each hotel operator for in-room retailing," but that NOMI retained the right to "supply competitor products to hotel operators for in-room retailing," with certain restrictions. *Id*. § 6.

88.    The Supply Agreement also contained a broad confidentiality provision, stating that (1) each party agrees "that it shall acquire no rights to or interest in any Confidential Information of the other party; other than the right to use such Confidential Information during the [contract] term for the sole purpose of performing its obligations under this Agreement"; (2) the parties agree that "use or duplication of Confidential Information for any purpose other than as required under this Agreement, or by any unauthorized person or entity, would constitute an unfair method of competition and a violation of this Agreement"; and (3) the parties acknowledge that "Confidential

Information of the other party may be trade secrets of that party, and the recipient party . . . shall (a) not use such Confidential Information in any other business or capacity; (b) at all times maintain the absolute confidentiality of such Confidential Information; (c) not make unauthorized copies of any portion of the Confidential Information disclosed in writing or otherwise; and (d) adopt and implement all reasonable procedures to prevent unauthorized use or disclosure of Confidential Information." *Id*. § 14.

89.    The Agreement further provided that "all provisions of this Agreement that by their nature should survive termination shall so survive, including, without limitation, indemnities, payment obligations, remedies, and forum selection." *Id*. § 27.

90.    Once more, NOMI felt comfortable continuing to do business with Lauder—and continuing to disclose its most valuable trade secrets to Lauder—due to the confidentiality protections of this contract.

91.    With the Supply Agreement in place, later in 2020, NOMI began engaging with hotel partners to develop further distribution deals. NOMI analyzed relevant market data to create customized cosmetics kits for these hotel partners, based on their customers' individual data and preferences. NOMI entered into several such successful hotel partnerships.

92.    The parties continued to work together to implement the 2020 Supply Agreement through August 2020, when Lauder asked specifically to "discuss what resources are needed in particular for ELC to receive NOMI's data, as they have a unique business model." Lauder requested access to data beyond just sales information, evidencing Lauder's interest in obtaining consumer profile data and detailed financial models on NOMI's use of funds, profit margins, sales mixes, financial forecasting, and its internal venture capital model. Lauder understood that it

needed to set up specific systems for receiving hotel consumer data from NOMI based on NOMI's own proprietary methods.

93.    Through 2020 and 2021, Lauder continued to request (and NOMI continued to provide) detailed data and information about its technology, business plans, and operations. For example, in January 2021, Lauder employees requested that NOMI provide various types of EDI (Electronic Data Interchange) information about NOMI's data systems—above and beyond what Lauder would need to effectuate the parties' standard sales reporting under the Supply Agreement. This shows that Lauder's interest in NOMI went far beyond a simple hotel partnership. At the time, NOMI believed that Lauder was still pursuing an investment or acquisition, but in retrospect it is clear that Lauder was mining NOMI for as much information as possible about NOMI's trade secrets and other proprietary information.

94.    In addition, NOMI spent significant time explaining to Lauder the benefits and inner workings of its proprietary stylist scheduling software, and Lauder expressed interest in how this type of software might be applied to Lauder's stylist scheduling needs at their MAC retail locations. At one point, Lauder personnel inquired as to how the proprietary scheduling software was coded.

95.    During this period, Lauder and NOMI were still discussing the new system NOMI was building, which would have included such features as an "OmniChannel System to various retail systems (physical and digital)," "Live Signal to an on-demand retail endpoint or physical retail point," "Connectivity/Matching of user profile into omnichannel (from appointment, purchase, or pop-up)," and "Pre-loaded shopping or exploratory cart (later build-out)." (Each of these concepts were also later featured in Lauder's China rollout, described more below.)

96.    NOMI at all times ensured that its confidential information and proprietary technologies were closely guarded.  In addition to the confidentiality provisions in the contracts between Lauder and NOMI, NOMI also prioritized confidentiality in its other business relationships. For example, NOMI's contracts with its hotel partners included confidentiality provisions stating that "each party agrees to protect the confidential information of the other," that "neither shall disclose the confidential information to any third party without the other's prior written consent," and that "the partes will use the other's confidential information only to the extent necessary to fulfill [their] obligations hereunder." Similarly, NOMI's contract with its investment banker required that the banker "keep confidential all non-public information concerning the Company provided to [banker]."

F.    Lauder's Breaches and Betrayals

97.    Beginning primarily in 2021, Lauder began to not only fail to deliver on various of its contractual obligations with NOMI but also began intentionally using NOMI's trade secrets for its own purposes, separate and apart from any contemplated partnerships between the two companies.

1.    Lauder Deploys NOMI's Trade Secrets in China and the United Kingdom.

98.    Throughout 2021, Lauder repeatedly failed to perform its end of the deal on NOMI's hard-won hotel partnerships. For example, Lauder refused to offer products for "turn down service" under the Supply Agreement, wherein hotels would purchase products to provide to guests for free. Lauder also repeatedly cut the volume of products it would make available to NOMI for use at partner hotels, while, at the same time, Lauder knew that these products were in high demand with NOMI's hotel partners, who were requesting multiples of these product volumes.

99.    Also in 2021, unbeknownst to NOMI, Lauder began a separate partnership with a major U.S. hotel chain to distribute beauty products in Hainan Province, China, and a partnership

37

with the China Duty Free Group. Lauder's China launch reflects many of the precise details of the business plans and trade secrets that NOMI had presented to Lauder previously—but NOMI was cut out of this deal.

100.    Lauder intentionally and maliciously hid from NOMI the timing and details of its China launch to keep NOMI in the dark about Lauder's blatant theft of NOMI's IP. For example, as late as September 2022, NOMI had a discussion with now-Chief Data Officer Jane Lauder and another top executive, where NOMI and Lauder specifically discussed a China launch roadmap and other opportunities for NOMI and Lauder to work together. Ms. Lauder concealed from NOMI that Lauder had already started to deploy these same business strategies, taken from NOMI, in China over a year earlier.

101.    There is substantial overlap between the business strategies and trade secrets that NOMI presented to Lauder, on the one hand, and Lauder's "Consumer Profile Modeling" and omni-channel services in China, on the other hand. The striking similarities between Lauder's China rollout and NOMI's trade secrets demonstrate Lauder's blatant reliance on NOMI's confidential information.

102.    For example, in July 2021, Lauder launched "pop-up" stores within hotels in China, where Lauder began collecting first-party data on hotel customers using NOMI's proprietary platform and business plans. Lauder's press releases announcing its China launch even used the exact same terms that NOMI has previously coined, including "Omnichannel," which NOMI used in confidential presentations to Lauder during their merger talks. Upon information and belief, Lauder also relied on NOMI's innovative ideas in the hotel beauty retailing context (such as in-room mini bar purchases, in-room sampling (turn-down services), pop-ups, in-depth tracking of hotel guest data, funneling of hotel guests to use certain products and services, entering into

exclusive partnerships with hotel partners, and facilitation of customer payments/data by integrating into hotels' existing software) in its China travel-retail rollout and Chinese hotel partnerships.

103.    Similarly, Lauder announced in Hainan in mid-2024 its "Skin Longevity Institute," whereby Lauder provides spa-related services through physical locations that entail private consultations with aestheticians who run diagnostics on the consumer while incorporating Lauder products into the treatment. Lauder has since expanded the Skin Longevity Institute beyond China to other locations, such as Costa Rica through a hotel partnership there. Upon information and belief, Lauder is using its "high-touch services" through the Skin Longevity Institute consultations to collect and build consumer profiles in the exact same way that NOMI identified for Lauder in connection with NOMI's own spa services and pop-ups.

104.    Meanwhile, in the United Kingdom, Lauder announced through its Clinique brand its "plans to build up customer loyalty by creating customer profiles around their virtual consultations drawn up from quizzes and personal details shared by shoppers." These "virtual consultations" appear to be based on the same approach NOMI took to profiling consumers through its pop-ups, using personal interactions with stylists to gather specific kinds of consumer-level data through interviews and questionnaires.

105.    The parties' course of dealing shows that Lauder wanted NOMI to believe that the parties were developing an omnichannel together, whereby NOMI could sell products directly to consumers and to integrate those in-person touch points, first-person data, and consumer profiling with online "Brand Boutiques" that would drive additional sales. These Brand Boutiques would allow for the consumer data NOMI collected through its appointments and other services to be used in real time on the branded websites.

106.    In actuality, however, Lauder had from the beginning feigned interest in a partnership with NOMI and was simply stringing NOMI along to steal NOMI's intellectual property and gain a head start in the market, which Lauder ultimately did with its first omni-channel rollout in Hainan and its other efforts to build consumer profiles outside the United States.

107.    Like NOMI, Lauder intended to host "beauty workshops" in Hainan and provide "in-room product samples." Lauder unveiled "travel retail-exclusive sets" of cosmetics for skincare. Lauder launched its new WeChat and Social Circle apps in China to create a platform for customer engagement specifically targeted to travelers and Duty Free shopping. Lauder explained that the "Marriott Bonvoy hotel guests can shop the brand's latest products, via the Estee Lauder Duty Free Social Circle, through branded pop-up shops inside the hotels." When paired with Lauder's hotel and Duty-Free partnerships in China—and the very language NOMI introduced to Lauder, such as the omnichannel and "Social Share," now called "Social Circle"—this formed Lauder's first deployment of an omnichannel that was based on NOMI's trade secrets.

108.    This is exactly the kind of experience NOMI was building in the United States, with hotel partners and branded websites to marry the digital and real-world experiences, both driven by the style profile of the consumer developed through NOMI's proprietary data collection strategies and data collection at physical stores.

109.    The features of Lauder's China rollout reflect the innovations NOMI brought to Lauder in other ways as well. For example, Lauder lifted from NOMI the idea for the "Live-Signal" feature, a technology involving (among other innovations) live-tracking of customers' locations, in which a digital customer would be directed to a physical retail end-point, meaning consumers would not be charged for the items in their shopping cart until they were within the physical boundary of the Duty Free zone. The questionnaires, visual prompts, evaluations, and product

recommendations on Lauder's mobile applications are exactly the kind of zero- and first-person data collection and consumer experience that NOMI developed and brought to Lauder beginning in 2018. Lauder falsely claimed its collaboration with a hotel and duty-free retailer was "unprecedented."

110.    The use of NOMI's strategies and technology relating to travel retail was clearly very valuable to Lauder—Lauder itself has repeatedly reported that its travel retail sector has become increasingly important to its overall business model. Not coincidentally, Lauder's rapid growth in the travel retail cosmetics sector—which is NOMI's *precise* market—occurred during the exact time frame that Lauder was purloining NOMI's proprietary technologies.

111.    For example, in March 2022, Lauder reported that its "global travel retail business [] has grown from approximately 6% of ELC's net sales in fiscal year 2004 to approximately 28% in fiscal year 2021," that "since . . . 2019, [Lauder] has seen tremendous growth within The Estee Lauder Companies' Travel Retail business," and that Lauder's strategy of "pivoting their focus to Hainan and Chinese domestic travel have been critical to maintaining success for the channel and the company." The same article reported that this unprecedented success in the retail travel sector was due to Lauder's newfound focus on "building new capabilities, simplifying processes, and investing in learning and technology to set up travel retail for sustainable, long-term success"— precisely the capabilities which NOMI taught to Lauder through the parties' partnership.

112.    As another compelling example, NOMI had previously proposed to Lauder an innovative idea for a new payment-sharing system for group orders in the duty-free context. As described above, based on NOMI's unique market research on the Chinese cosmetics market, NOMI had discovered that Chinese travelers would often make large group purchases on behalf of their friends and family while visiting duty-free retail locations. To cater to this unique

demographic, NOMI proposed a novel payment sharing platform (the exploratory cart), wherein friends and family of a traveler could add items to, and separately pay for, products that the traveler would then conveniently pick up at the duty-free location. During the course of the parties' relationship, NOMI provided Lauder with detailed plans for this payment-sharing platform, including projections of logistics costs and expected profits.

113.    Lauder then launched *this exact same* payment sharing system in its China launch, calling it "Duty Free Social Circle." Even the name itself implies it is a copy of NOMI's system architecture, which included the Social Share feature set, described above. No other company in the beauty industry had ever implemented such a payment-sharing system prior to this. The launch was not publicized in the United States, and was described principally in Chinese-language releases. Lauder purposefully hid its rollout from NOMI, which only discovered Lauder's breach much later.

114.    In Lauder's new WeChat Mini app, consumers could create a "Friend Circle" to invite their WeChat friends to share the shopping cart and place a group order together. The consumer who creates the "Friend Circle," known as the "Circle Leader," can view each member of the "Friend Circle," and what products the other members have added to the shopping cart. The Circle Leader can then place a group order on behalf of all members, while charging each member individually. This is *precisely* the trade secret that NOMI developed to facilitate split payments and the very application of that system to Duty Free that NOMI described to Lauder.

115.    Further, Lauder admits it is using its "Consumer Profile Modeling" for a "deepened understanding of" Lauder's travel retail target audience. Lauder's "[a]bility to develop consumer profiles based on the observation of 1st party consumer data" helps Lauder in "closing the loop to help the brand better prospect & target Travel Retail consumers." "Building a consumer profile

model provides a deeper understanding of Estée Lauder Travel Retail's target audience. Estée Lauder's Travel Star Circle can establish consumer profiles based on observations of first-party consumer behavior data, helping the brand better focus and position travel retail consumers from third- and fourth-tier cities, thereby achieving a closed-loop marketing cycle."[2] This again is exactly what NOMI developed through its style profiles and technology platform.

116.    To add insult to injury, at the time that Lauder was planning (and then rolling out) its China launch, Lauder was still actively working with NOMI as a business partner, while concealing from NOMI the fact that it had stolen these ideas. At no point did Lauder tell NOMI that Lauder had *already launched* these concepts in China.

117.    Olivier Bottrie, the Lauder executive who was learning from NOMI at the start of the companies' relationship, oversaw the China rollout and falsely claimed he "was early to recognise the opportunity in marketing to the Chinese travelling consumer globally as well as seizing upon the online pre-tail opportunity to unlock growth. He expanded the company's brand portfolio aggressively in the channel and led the development of new capabilities in product innovation, digital engagement, education and business intelligence and analytics."

118.    In 2022, Lauder also rejected key proposed hotel deals that NOMI negotiated (wherein NOMI would have distributed Lauder products at several leading US hotels). Lauder's stated reasons for rejecting these deals were nonsensical and contradictory (*e.g.*, asserting that one selected brand was insufficiently high-end, or rejecting another brand that it had previously accepted). Lauder's irrational rejection of these deals caused NOMI to lose out on lucrative hotel partnerships that would have been worth over $300 million annually.

---

[2]    Upon information and belief, Lauder's "Travel Star Circle" and "Social Circle" are synonymous and are simply variations in the translation based on different Chinese-language articles and press releases concerning Lauder's China launch.

2.  Lauder Sabotaged NOMI's Hotel Partnership and Stole NOMI's Concepts for Its Exclusive Kits.

119.  Kept in the dark about Lauder's China rollout, on August 11, 2022, NOMI entered into a potentially lucrative agreement with a leading hotel chain in Washington D.C., estimated to be worth $780 million. This 2022 hotel deal was particularly important for NOMI because it was expressly intended to be a trial-run test of NOMI's capabilities; and a successful rollout at this hotel chain would mean that NOMI would be very well-positioned to obtain similar deals with other locations within the same hotel brand. Lauder expressed that this was "Great news" and told NOMI, "Congratulations on closing the deal."

120.  NOMI ordered the custom kits it designed for Lauder for the D.C. hotel chain, and received some initial test units from Lauder as part of a production run. Lauder requested (and NOMI provided) a copy of this hotel contract.

121.  On August 17, 2022, Lauder inexplicably informed NOMI that it could not perform under the contract. Lauder's Vice President of Account Management stated with regard to the kits that, "While I am not certain who has confirmed that units are produced, I do not have them available to ship nor do I have an ETA at this time." NOMI, however, knew that the kits *had*, in fact, been produced, because Lauder's head of supply had informed Ms. Robinson that the kits *were* produced, and because NOMI had already received a small amount of kits that Lauder had shipped to its corporate office.

122.  In a further breach and betrayal, in September 2022 NOMI also discovered that Lauder was selling these custom kits at various retail stores and later on at online locations—such as The Company Store, Amazon, and Lauder's website—even though these kits were supposed to be for NOMI's exclusive use in select hotels, under the 2020 Supply Agreement. Lauder rushed

these kits to market, behind NOMI's back. The kits were very commercially successful and were selling fast, but NOMI was unfairly cut out from any share of the profits.

123.    Separately, Lauder also misappropriated a second custom kit mix from NOMI. Using its proprietary data and analysis, in 2020 NOMI had designed a custom skincare kit mix for Lauder's exclusive set. In May 2020, Lauder informed NOMI that Lauder would not be including one of NOMI's requested products in this kit (a facial cleanser), because Lauder thought the cleanser "look[ed] too similar" to the other products and because the "makeup remover was more important." Lauder insisted on going forward with this new mix—which NOMI believed to be inferior—over NOMI's advice. NOMI later discovered (in or around 2022), that Lauder was indeed selling NOMI's exact custom mix (with the requested cleanser), but in an unusual way. Lauder had replaced the products in one of its existing retail kits (the Power Nap Facial kit) with *NOMI's exact product mix* (which NOMI previously shared with Lauder in Spring 2020). Lauder's new kit was rolled out internationally to numerous retailers, including Macy's, Saks, Harrods, and others. This covert product swap and quick rollout of the kit was conducted without NOMI's knowledge or approval, in order to test the strength of the product mix (and thereby test the strength of NOMI's proprietary data which went into building this carefully crafted product mix).

124.    Below are side-by-side pictures of the NOMI's custom kit and the copycat kits sold by Lauder through non-NOMI distribution channels. On the right (the "Skincare Retreat") is the exclusive kit designed by NOMI meant to be used through its hotel distribution partnerships. On the left (the "Power Nap Facial") is Lauder's copycat kit:



125.    Due to the popularity and success of NOMI's custom kit, Lauder continued to sell the "Power Nap Facial" without NOMI's knowledge at online locations and retail stores around the world, including Harrod's, Macy's, and Blue Mercury.

126.    After Ms. Robinson confronted Lauder with its unauthorized sales of the custom kits, Lauder quickly reversed course and admitted it had indeed produced the custom kits, but offered no explanation for its reversal or for its unauthorized sale of the kits in retail stores.

127.    In early September 2022, Ms. Robinson had a discussion with Jane Lauder, and explained how Lauder's actions were jeopardizing the lucrative D.C. hotel deal that NOMI had just landed, and Ms. Lauder and her staff members (falsely) assured Ms. Robinson that Lauder would uphold its end of the bargain and not take actions that would put the hotel deal at risk.

128.    Nevertheless, after failing to abide by its contractual obligations, on September 22, 2022, Lauder informed NOMI that it intended to terminate the 2020 Supply Agreement. The termination notice also stated that Lauder would not accept any further orders from NOMI, beyond the initial quantity it had already accepted.

129.    In October 2022, Lauder informed NOMI that the products NOMI had previously ordered for the D.C. hotel chain would be delayed. Every week for months, Lauder continued to lead NOMI on with false promises that the kits would be delivered soon. More than two months later, Lauder finally shipped a limited amount of the products to an old office address of NOMI Beauty on Christmas Eve—a day no one would be around to notice or receive the products, and to an address that had never been given to Lauder. Upon information and belief, Lauder knew that mishandling the delivery of kits to NOMI would be extremely damaging to NOMI's business.

130.    Ultimately, Lauder did not ship the corrected order until early in the following calendar year, long after NOMI and the hotel had been promised. Lauder's failure to perform resulted in the destruction of NOMI's burgeoning and potentially lucrative relationship with this hotel chain, and other hotel deals similarly faltered after word spread of Lauder's nonperformance.

3.    Lauder Destroyed NOMI's Relationship with Lab Series.

131.    Adding further insult to injury, during 2022 Lauder also intentionally destroyed NOMI's business relationship with a third-party, Lab Series Skincare for Men ("Lab Series").

132.    Beginning in the Spring of 2020, NOMI had a burgeoning business relationship with Lab Series, a skincare company and subsidiary of Lauder that had been interested in partnering

47

with NOMI to place its products in hotel rooms. The relationship progressed far enough that the parties were exchanging draft contracts for a supply partnership agreement, similar to the contract that NOMI had entered into with Lauder.

133.    Lauder knew of this relationship, and intentionally interfered with it. Upon information and belief, beginning in the Summer of 2022, Lauder instructed Lab Series to stop working with NOMI.

134.    Lauder's unfair interference caused the complete destruction of the promising relationship between NOMI and Lab Series.

        4.      Lauder's Continued Use of NOMI's Trade Secrets.

135.    After the parties' 2020 Supply Agreement terminated in April 2023 (following expiration of the six month period triggered by Lauder's September 2022 notice), Lauder continued to employ NOMI's trade secrets in multiple distribution channels, throughout the U.S. and China. To this day, Lauder continues to expand these stolen programs throughout the world in many stores and hotels.

136.    In January 2023, Lauder was experiencing such a degree of success with its travel retail division (and specifically, with its expanded China travel retail sector), that it appointed several new executives to "grow [its] travel retail leadership team," which focused on an "omni-channel mindset" and aimed "to drive growth in China and Hainan." These are business plans and techniques lifted directly from NOMI.

137.    In July 2023, Lauder "teamed up with China Duty Free Group" for a "campaign across Hainan," which featured "pop-ups" at luxury hotels throughout Hainan, where "shoppers can engage with beauty advisors and discover Estee Lauder's summer travel exclusive sets." The campaign sold a "Glowing Skin Essentials set, a five-piece kit, [which] encompasses a travel routine in a box, from cleanser to face and eye care." This unique combination of ideas (targeting

duty-free shoppers in China, using pop-ups with beauty advisors at luxury hotels, and selling a specific 5-piece travel cosmetics kit) is a blatant copy of NOMI's business model.

138.    As another example, in February 2024, Lauder debuted a new "pop-up" store that offers "[p]rivate service consultations." Customers can "experience this through reservations on the CDF member WeChat Mini Program." In other words, Lauder is allowing consumers to make appointments at pop-ups through an app, and then funneling those users' data into a tracking system—which was a core innovation developed by NOMI.

139.    As an additional example, in June 2024, Lauder partnered with a "five-star hotel" in Malaysia to offer in-room cosmetics products to customers, in precisely the same way that NOMI had. An article reported that the hotel "bathroom was filled with Estee Lauder products such as their essence water, face mask, lip care, [and] eye cream." The article also reported that Lauder had "branded the hotel's entrance, lobby, and rooms"—ideas which NOMI had also proposed to Lauder. A customer's social media post demonstrates that Lauder's hotel partnership featured product collections that were based on NOMI's mini-bar product sets:



140.    In essence, once it became apparent that NOMI's unique formula of tech-based beauty was a goldmine, Lauder cut NOMI out of the deal and began to use NOMI's trade secrets for its own benefit. Lauder's actions throughout the course of the parties' relationship clearly demonstrate that Lauder never actually intended to work alongside NOMI—Lauder only wanted to string NOMI along for long enough to steal all of NOMI's intellectual property, and then "unveil" the new technologies and claim them as its own. Lauder lured NOMI in with promises of a fruitful partnership and eventual acquisition, to learn everything it could from NOMI, only to then destroy NOMI.

141.    The proprietary innovations NOMI developed, such as its insights into how to engage in beauty consumer data collection and how to deploy the analytics of that data in real-world applications like hotels and duty-free, were handed over to Lauder pursuant to contracts that expressly recognized these technologies were trade secrets, and Lauder then abused that trust to cut NOMI out. NOMI deserves to be fairly compensated for the immense damages it suffered due to Lauder's unethical and predatory practices, and Lauder should be enjoined from continuing to exploit NOMI's valuable trade secrets without authorization and compensation.

142.    Prior to the filing of this lawsuit, NOMI and Lauder entered into a tolling agreement pursuant to which the period from February 19, 2025, through January 16, 2026, would be excluded from the computation of time for any statute of limitations or any other limitations period for NOMI's claims against Lauder.

## **FIRST CAUSE OF ACTION**

### **Breach of Contract (2018 Confidentiality Agreement)**

143.    Plaintiff hereby repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

144.    The parties' 2018 Confidentiality Agreement provided that Lauder "agrees to keep all" materials provided by NOMI in connection with the parties' merger talks "confidential and to take commercially reasonable steps to ensure that all of its affiliates . . . also keep such [material] confidential." Conf. Agmt. § 1. Lauder agreed to "maintain in strict confidence . . . the nature, extent, terms, and status of [the] negotiations and discussions" between the parties, and to not "discuss [or] disclose" any of the confidential materials "except with the prior written approval of each of [NOMI] and [Lauder]." *Id*.

145.    While the confidentiality obligations affirmatively imposed on Lauder under Section 1 of the agreement expired after two years, other obligations under the 2018 Confidentiality Agreement extended beyond that term. The agreement further provided that Lauder "agrees to use" NOMI's confidential materials "solely for the purpose of evaluating a possible Transaction between" the parties, and that it "shall not disseminate or disclose" the materials to any person other than those "who need to know such information for the purpose of evaluating a possible Transaction between the parties." *Id*. § 2.

146.    Moreover, NOMI's confidential materials were to "remain the sole and exclusive property" of NOMI" and "no right or interest therein is transferred by virtue of this Agreement, except for the limited right to use such [materials] in connection with a possible Transaction." *Id*. § 3.

147.    The parties also agreed that "the confidentiality obligations set forth in this Agreement shall survive indefinitely." *Id*. § 5.

148.    Thus, the Confidentiality Agreement made clear that Lauder was prohibited from using NOMI's confidential materials for any purpose other than evaluating the potential merger, in

perpetuity. The protections contained in this Confidentiality Agreement were the only reason that NOMI felt secure in disclosing its valuable trade secrets to Lauder.

149.    This contract was fully valid and executed by both parties on April 23, 2018.

150.    NOMI performed its obligations under this contract by, among other things, providing its confidential trade secrets to Lauder, and by protecting and respecting the secrecy of Lauder's confidential information.

151.    Lauder betrayed NOMI's trust—and breached the 2018 Confidentiality Agreement—by using NOMI's confidential information for purposes other than the contemplated merger between the parties. As detailed above, Lauder misappropriated NOMI's confidential information and used it for its own commercial gain (and without NOMI's knowledge or permission), by, among other things, using NOMI's confidential information to develop business strategies and technologies for purposes other than a transaction between the parties, such as employing NOMI's confidential information in Lauder's development of and later omnichannel launch in China in 2021.

152.    Lauder's breach proximately caused substantial damages to NOMI, in the way of lost business opportunities, lost profits, and loss of business reputation.

## SECOND CAUSE OF ACTION

### Breach of Contract (2020 Supply Agreement)

153.    Plaintiff hereby repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

154.    The parties' 2020 Supply Agreement contained confidentiality provisions restricting Lauder from using NOMI's data for secondary purposes.

155.    Specifically, the 2020 Supply Agreement contained a broad confidentiality provision, stating that (1) each party agrees "that it shall acquire no rights to or interest in any Confidential Information of the other party; other than the right to use such Confidential Information during the [contract] term for the sole purpose of performing its obligations under this Agreement"; (2) the parties agree that "use or duplication of Confidential Information for any purpose other than as required under this Agreement, or by any unauthorized person or entity, would constitute an unfair method of competition and a violation of this Agreement"; and (3) the parties acknowledge that "Confidential Information of the other party may be trade secrets of that party, and the recipient party . . . shall (a) not use such Confidential Information in any other business or capacity; (b) at all times maintain the absolute confidentiality of such Confidential Information; (c) not make unauthorized copies of any portion of the Confidential Information disclosed in writing or otherwise; and (d) adopt and implement all reasonable procedures to prevent unauthorized use or disclosure of Confidential Information." *Id*. § 14.

156.    The 2020 Supply Agreement further provided that "all provisions of this Agreement that by their nature should survive termination shall so survive, including, without limitation, indemnities, payment obligations, remedies, and forum selection." *Id*. § 27.  As with the 2018 Confidentiality Agreement, it was the parties' intent that the confidentiality provisions of the 2020 Supply Agreement survived its termination.

157.    Once more, NOMI felt comfortable continuing to do business with Lauder—and continuing to disclose its trade secrets to Lauder—due to the confidentiality protections of this 2020 Supply Agreement.

158.    This contract was fully valid and executed by both parties, with an effective date of April 24, 2020.

159.     NOMI performed its obligations under this contract by, among other things, providing its proprietary information to Lauder; by protecting and respecting the secrecy of Lauder's confidential information; and by successfully entering into numerous partnerships with hotel operators to sell Lauder's products.

160.     Lauder betrayed NOMI's trust—and breached the 2020 Supply Agreement—by using NOMI's confidential information for purposes other than the contemplated hotel distribution. As detailed above, Lauder misappropriated NOMI's confidential information and used it for its own commercial gain (and without NOMI's knowledge or permission).

161.     Lauder's breach proximately and directly caused substantial damages to NOMI, in the way of lost business opportunities, lost profits, and loss of business reputation.

## THIRD CAUSE OF ACTION

### Breach of Contract (2020 Supply Agreement)

162.     Plaintiff hereby repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

163.     Additionally, Lauder also breached the 2020 Supply Agreement by diverting exclusive cosmetics kits away from NOMI, and by failing in its distribution obligations to NOMI's hotel partners.

164.     The 2020 Supply Agreement contemplated that the custom cosmetic kits NOMI developed for Lauder would be exclusively sold by NOMI in the parties' mutually-agreed-upon hotel partner locations (*see* Supply Agmt. §§ 2, 4, 5, 6). Beginning in 2022, Lauder breached this provision by selling NOMI's custom kits at Lauder's traditional retail stores without informing NOMI.

165.    The 2020 Supply Agreement also contemplated that Lauder would distribute these custom kits to the hotel partners per the orders placed by NOMI, and that Lauder would make such deliveries in a timely fashion (*see* Supply Agmt. §§ 2, 9, 10). In the fall of 2022, Lauder breached this provision by failing to deliver products in a timely fashion to NOMI's hotel partner (a prominent D.C. hotel chain), resulting in the destruction of NOMI's promising relationship with this hotel chain.

166.    These breaches proximately and directly caused substantial damages to NOMI in the way of lost business opportunities, lost profits, and loss of business reputation.

## **FOURTH CAUSE OF ACTION**

### **Misappropriation of Trade Secrets (18 U.S.C. § 1836)**

167.    Plaintiff hereby repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

168.    Plaintiff brings this cause of action under the federal Defend Trade Secrets Act (18 U.S.C. § 1836).

169.    In sum, NOMI developed and possessed numerous trade secrets, Lauder unethically misappropriated those secrets, and Lauder then used those secrets in breach of both the parties' agreements and their confidential relationship.

### NOMI's Information Qualified as a Trade Secret

170.    NOMI's trade secrets that it shared with Lauder consisted of multiple components, including but not limited to:

a.    NOMI's system architecture. This trade secret encompasses the NOMI platform's unique, proprietary combination of system architecture, user interface, software/underlying source code and algorithms (both those that were custom-built

in house by NOMI and those that NOMI sourced/combined/adapted from existing third-party services), user-facing design, and overall operations. The architecture NOMI designed allowed for multiple unique points of data collection from beauty customers (gathered via in-person appointments, pop-ups, tracking of in-room hotel purchases, NOMI's apps and online platforms, customer questionaries, etc.); stored and aggregated that data in a useful way; provided data insights and noted buying trends for individual consumers and groups of consumers; made recommendations for new ways to target these consumers; and allowed for ways to export and use this data by third parties (such as hotel business partners).

b. Split payments. NOMI developed the idea and methods for a "payment project" involving an "exploratory cart" that would allow retailers to accept split payments from groups of customers, including in the duty-free context. The Exploratory Cart also allows each consumer to have their own sub-cart within another member's cart. Apart from facilitating payments, NOMI designed methods for how to collect individualized data from multiple consumers in a group purchase.

c. Travel retail business strategy. NOMI developed proprietary business strategies for targeting international travelers at duty free locations, including in China. NOMI's strategy involved leveraging pop-up retail sales and stylist appointments at duty-free locations (*e.g.*, luxury hotels and airports), using NOMI's proprietary scheduling software to maximize the number of appointments in a given day, and using such sales and appointments to collect consumer data and build consumer profiles via NOMI's system architecture, and then repurpose that data to support further sales.

d.  NOMI's exclusive and customized kits or bundles of cosmetics products. NOMI designed a specific collection of cosmetics products tailored to the needs of travelers based on research into consumer preferences. The selection of which products to bundle together consisted of NOMI trade secrets.

e.  Proprietary methods for zero- and first-person consumer data collection. NOMI developed methods for using in-person stylist visits (*e.g.*, bridal makeup appointments, pop-up appointments in hotels) to covertly gather data about customers' consumption preferences via casual conversations. NOMI also designed customer surveys and questionnaires that used specific techniques that NOMI determined were the most effective ways to capture accurate reflections of a consumer's true preferences. NOMI then determined how to log, translate, and track that data in a useable format, to be reused in retail stores and other locations.

f.  The NOMI omni-channel. NOMI designed a multi-channel cosmetics platform offering customers multiple ways of engaging with NOMI and its services—and multiple avenues for NOMI to collect consumer data and sell products. For example, NOMI offered on-demand makeup appointments at hotels, pop-up appointments in duty-free locations like airports or hotel lobbies, curated mini-bar products for purchase inside of hotel rooms, and online portals/apps for purchases and appointment scheduling.

g.  Consumer data from in-room hotel purchases. NOMI used its proprietary platform to track in-room purchases by hotel guests, and to collect, aggregate, and sort this data into useful trackable metrics. This platform also streamlined the distribution and product inventory tracking processes. As part of its core business model, NOMI

offered hotels access to this platform for free in exchange for the exclusive rights to distribute beauty products in that hotel.

h.  In the alternative, to the extent that the individual ideas/components listed immediately above might not qualify as trade secrets individually, the entire bundle of concepts and ideas that went into NOMI's unique platform cumulatively or in some combinations constitute novel and protectable trade secrets. In other words, NOMI's trade secrets were the unique combination of its system architecture, software, design, methods of data collection, storing, and aggregation, omni-channel system, exclusive cosmetics kits, split payments plan, and travel retail business plan—the way in which NOMI's various tech and business components fit together as building blocks to form a unique whole.

171.   NOMI expended considerable time, effort, and money in developing these trade secrets, which were extremely valuable assets to the company. For example, NOMI developed its proprietary technology platform and systems architecture over years, moving through several iterations of development and testing until NOMI arrived at what it considered optimal organizing principles.

172.   NOMI's trade secrets were not generally known outside of NOMI and Lauder (subject to the confidentiality provisions of the 2018 and 2020 agreements between the parties), and within the two companies NOMI's trade secrets were known by only a small circle of individuals—at least, until Lauder converted those trade secrets for its own benefit and presumably disseminated them more widely internally.

173.   NOMI took reasonable measures to guard the secrecy of its trade secrets and to ensure that its data, infrastructure, and codebase were secure. NOMI did this by the use of

confidentiality agreements, as well as technical solutions such as multi-factor authentication and strong passwords, cycling of passwords, limiting access according to the principle of least access, and protecting access with firewalls and brute force protection where applicable.

174.    NOMI's trade secrets were not susceptible to easy duplication or reverse-engineering.

175.    NOMI's trade secrets derived independent economic value from not being generally known and not readily ascertainable by others. At the time NOMI developed its trade secrets and shared them with Lauder, there was no other company in the cosmetics industry obtaining and leveraging zero- and first-person consumer data in the way NOMI did.

<u>Lauder Misappropriated NOMI's Trade Secrets</u>

176.    As detailed above, Lauder misappropriated NOMI's confidential information and used it for its own commercial gain (and without NOMI's knowledge or permission), by, among other things, employing NOMI's trade secrets in its 2021 United States, China, Costa Rica, and U.K. launches, misappropriating NOMI's omni-channel distribution platform, selling the NOMI-designed custom cosmetics kits through retail channels before NOMI launched its sale of those same kits, misappropriating NOMI's split-payment technology, and misappropriating NOMI's proprietary software and systems architecture.

177.    Lauder stole NOMI's trade secrets by improperly retaining the confidential information that was provided to Lauder for use in only one context—the contemplated merger and/or business partnership between the parties. Instead of using this information for its intended limited purpose, Lauder knowingly retained the information in bad faith and maliciously used it to launch its successful new campaigns.

<u>Lauder Unfairly Profited from NOMI's Trade Secrets</u>

178.    NOMI's trade secrets were quite valuable (both to NOMI and its competitors), as evidenced by the massive profit that Lauder raked in after it misappropriated them.

179.    As just one example, an analysis of Lauder's revenue streams from 2020 to 2021 shows that, after Lauder launched the Duty Free Social Circle app (which it directly lifted from NOMI's Social Share and related feature sets), Lauder's revenue from its largest customer (a China duty-free retailer) more than doubled, from $1.03 billion in 2020 to $2.28 billion in 2021. Evidence points to Lauder's reliance on NOMI trade secrets to drive that revenue.

180.    Lauder's 2022 10-K credited innovations in product "repackaging and sets," expanding their "strategic presences in travel retail across duty-free locations," engagement with "consumers at the airport through compelling pop-up activations in non-traditional commercial areas," and investment in "new omnichannel concepts in the United States and China." Lauder explained during its Q1 2022 earnings call that it "deployed a technology solution, which enables brands to better customize consumer outreach by leveraging data to merchandize and personalize communication. This is leading to higher conversion rates for new consumers and a deeper level of relationship building after the initial purchase to foster retention. Initiatives such as these position us well to realize even greater success with trial and repeat." With Lauder's "consumer profile model" and "a new social e-commerce business model," Lauder anticipates it will turn "our daily traffic of 42,000 visitors into 4,000,000 consumers." Lauder credited the omnichannel to a "70% conversion of socially invited traffic," meaning, from one consumer who referred Lauder's Duty Free Social Circle to friends and family, 70% of those referrals turned into omnichannel users themselves. More recently, as reported in March 2024, because of the success of Lauder's duty free and hotel integration, Lauder is expanding the service through 15 additional company brands.

181.    This success has continued through the present day, with one 2025 article reporting that Lauder "made almost a fifth of its $14.3bn revenues last year in China," largely thanks to the Lauder's "travel retail hubs" in China.

182.    Given the size and proportion of Lauder's revenue attributable to travel retail, and in particular travel retail in China, the portion of Lauder's revenue that is driven by the innovations in NOMI's trade secrets is, and will be, substantial.

## FIFTH CAUSE OF ACTION

### Misappropriation of Trade Secrets (New York Common Law)

183.    Plaintiff hereby repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

184.    The allegations alleged in connection with NOMI's claim for misappropriation of trade secrets under the federal Defend Trade Secrets Act (18 U.S.C. § 1836) separately constitutes misappropriation of trade secrets under New York common law.

## SIXTH CAUSE OF ACTION

### Misappropriation of Ideas

185.    Plaintiff hereby repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

186.    NOMI and Lauder shared a contractual relationship and acted as close business partners for several years, until Lauder abruptly cut off contractual relations.

187.     NOMI developed several novel, unique, and valuable ideas (which are identified in ¶¶ 158(a)-(h)), including, among other things, NOMI's unique model in the cosmetics business of gathering first-person consumer data through hotel partnerships (including the sale of exclusive in-room cosmetics products), NOMI's omni-channel distribution platform (with multiple touch-

points where consumer data can be collected), NOMI's split-payment concept for facilitating multi-party transactions while still collecting consumer-level data, and NOMI's proprietary data software and systems architecture.

188.    In the alternative, to the extent that the individual ideas/components listed in ¶¶ 158(a)-(h) might not qualify as protectable ideas individually, the entire bundle of concepts and ideas that went into NOMI's unique platform (or some combination of them) cumulatively constitute novel and protectable ideas. In other words, NOMI's novel idea was the unique combination of its system architecture, software, design, methods of data collection, storing, and aggregation, omni-channel system, exclusive cosmetics kits, split payments plan, and travel retail business plan—the way in which NOMI's various tech and business components fit together as building blocks to form a unique whole.

189.    These ideas were concrete, specific, and not commonplace. At the time that NOMI developed these ideas, they were cutting-edge innovations in the cosmetics industry, and the ideas were far from widespread.

190.    Lauder unethically and in bad faith misappropriated NOMI's unique ideas, by, among other things, employing NOMI's trade secrets in its 2021 United States, China, Costa Rica, and U.K. launches, misappropriating NOMI's omni-channel distribution platform, misappropriating NOMI's split-payment technology, and misappropriating NOMI's proprietary software and systems architecture.

191.    NOMI's ideas were sufficiently concrete such that Lauder could use the ideas without substantial further development. The hard work that NOMI expended over years was to design and develop these concepts, meaning that Lauder was given a roadmap for how to engage with customers to collect useful data and build consumer profiles. When Lauder and NOMI first

started working together, for example, a high-level Lauder executive even asked, earnestly, "What can data do for a large company?"

192.    NOMI was damaged as a proximate cause of Lauder's misappropriations, and suffered damages including but not limited to lost business opportunities, lost profits, and loss of business reputation.

## SEVENTH CAUSE OF ACTION

### Breach of the Implied Covenant of Good Faith and Fair Dealing

193.    Plaintiff hereby repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

194.    Plaintiff brings this claim in the alternative to its breach of contract claim.

195.    The 2020 Supply Agreement between Plaintiff and Lauder contained an implied covenant of good faith and fair dealing pursuant to Uniform Commercial Code Section 1-304 as adopted by the State of New York.

196.    To the extent that the 2020 Supply Agreement did not contain an express provision stating that the custom cosmetic kits NOMI developed for Lauder would be exclusively sold by NOMI in the parties' mutually-agreed-upon hotel partner locations, then such a term is implied in the agreement. A reasonable person in Plaintiff's position would be justified in understanding that the agreement contained such an implied term. Beginning in 2022, Lauder breached this provision by selling NOMI's custom, exclusive kits at Lauder's traditional retail stores without informing NOMI, and NOMI suffered substantial damages as a result.

197.    To the extent that the 2020 Supply Agreement did not contain an express provision stating that Lauder would distribute these custom kits to the hotel partners per the orders placed by NOMI, and that Lauder would make such deliveries in a timely fashion, then such a term is implied

in the agreement. A reasonable person in Plaintiff's position would be justified in understanding that the agreement contained such an implied term. In the fall of 2022, Lauder breached this provision by failing to deliver products in a timely fashion to NOMI's hotel partner (a prominent D.C. hotel chain), resulting in the total destruction of NOMI's burgeoning and potentially lucrative relationship with this hotel chain.

198.    These breaches proximately and directly caused substantial damages to NOMI, in the way of lost business opportunities, lost profits, and loss of business reputation.

## EIGHTH CAUSE OF ACTION

### Unjust Enrichment

199.    Plaintiff hereby repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

200.    NOMI conferred non-gratuitous benefits upon Lauder—namely, allowing Lauder to view, access, and analyze NOMI's valuable confidential trade secrets and intellectual property.

201.    Lauder accepted and retained these benefits, was enriched by them, and utilized them to Lauder's advantage—for example, by, among other things, employing NOMI's trade secrets in its 2021 United States, China, Costa Rica, and U.K. launches, misappropriating NOMI's omni-channel distribution platform, misappropriating NOMI's split-payment duty free technology, and misappropriating NOMI's proprietary software and systems architecture.

202.    Lauder retained and used these benefits at NOMI's expense. Under the circumstances, it would be inequitable for Lauder to not compensate NOMI for the fair value of these lucrative benefits it received.

## NINTH CAUSE OF ACTION

### Unfair Competition

203.    Plaintiff hereby repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

204.    Lauder has engaged in unethical and immoral commercial practices in the cosmetics industry.

205.    Lauder has misappropriated, in bad faith and for its own commercial advantage, the trade secrets, ideas, labor, skills, expenditures, and intellectual property rightfully belonging exclusively to NOMI.

206.    As a direct result of Lauder's unfair commercial acts, NOMI suffered special damages, including but not limited to direct financial loss, lost dealings and business opportunities, and lost profits. Following Lauder's unfair withdrawal from the parties' contract and unethical purloining of NOMI's trade secrets and ideas, NOMI lost substantial profits and lost the opportunity to deploy its innovative platform idea in the duty-free market in China. Lauder unfairly diverted business to itself away from NOMI, and appropriated the potential customers that NOMI would have garnered had it been able to employ its idea before Lauder's theft.

207.    Further, as specifically stated in the parties' 2020 Supply Agreement, "use or duplication of Confidential Information for any purpose other than as required under this Agreement, or by any unauthorized person or entity, **would constitute an unfair method of competition** and a violation of this Agreement." Supply Agmt. § 14.4 (emphasis added).

## TENTH CAUSE OF ACTION

### Promissory Estoppel (Confidential Trade Secrets)

208.    Plaintiff hereby repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

209.    In the alternative, to the extent Lauder maintains that (for whatever reason) Plaintiff is barred from recovering under the confidentiality obligations under the parties' contracts, Plaintiff brings a claim for promissory estoppel.

210.    Lauder made a clear promise to NOMI that it would keep confidential NOMI's intellectual property and trade secrets during the parties' merger talks, and that Lauder would not use NOMI's trade secrets for any unauthorized purposes.

211.    NOMI reasonably and foreseeably relied upon Lauder's promise, disclosing numerous valuable trade secrets to Lauder over the course of several years, because NOMI trusted that Lauder would stay true to its word and not misuse these trade secrets.

212.    NOMI was injured in reliance on Lauder's promise because Lauder unfairly profited by unethically utilizing NOMI's trade secrets for its own personal benefit. Injustice would result should Lauder's promise not be enforced.

## ELEVENTH CAUSE OF ACTION

### Promissory Estoppel (Supply Agreement)

213.    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

214.    In the alternative, to the extent Lauder maintains that (for whatever reason) Plaintiff is barred from recovering under terms of the 2020 Supply Agreement, Plaintiff brings a claim for promissory estoppel.

215.    Lauder made a clear promise by word and action to NOMI to produce and deliver to NOMI the custom kits NOMI developed for sale through NOMI's hotel partnerships.  Lauder further agreed that the custom kits would be exclusive to NOMI, and that Lauder would not sell the custom kits through alternative distribution channels.

216.    NOMI reasonably and foreseeably relied upon Lauder's promise that it would deliver to NOMI its custom kits in time for NOMI to sell them.

217.    NOMI was injured in reliance on Lauder's promise because Lauder intentionally and deliberately reneged and breached such promise in bad faith after NOMI's acts in reliance upon them, intentionally causing the kits to be misdelivered and then asserting that the 2020 Supply Agreement was no longer in effect. Injustice would result should Lauder's promise not be enforced, and NOMI should be awarded damages, including for lost profits.

218.    Lauder's deceitful acts and breach of promises with knowledge that NOMI relied on such acts and promises, its intentional concealment of facts relating to the timing, delays, manner and location for deliveries under the promised obligations, and its beaches the Uniform Commercial Code, as adopted by the State of New York,  and implied covenant of good faith and fair dealing in such matters, evidences "unclean hands" in its dealing with NOMI, giving rise to a need for punitive damages to be assessed against Lauder in the interests of justice and public policy, irrespective of anything to the contrary that may be stated or implied in any documentation relating to the matter, which were blatantly breached by Lauder.

219.    Any claim by Lauder that the Supply Agreement's obligations were not breached as a consequence of unmet conditions precedent are rendered moot by Lauder's promises to deliver and NOMI's subsequent actions in reliance upon such promises.

## TWELFTH CAUSE OF ACTION

### Tortious Interference with Prospective Economic Advantage

220.    Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

221.    Beginning in the Spring of 2020, NOMI had a burgeoning business relationship with Lab Series, a skincare company that was interested in partnering with NOMI to place its

products in hotel rooms. The relationship progressed far enough that the parties were exchanging draft contracts for a supply partnership agreement.

222.    Lauder knew of this relationship, and intentionally interfered with it. Beginning in the Summer of 2022, Lauder directed Lab Series to not work with NOMI.

223.    Lauder acted out of malice and used unfair and improper means, including by acting out of personal ill-will towards NOMI's founder, Ms. Robinson, and by defaming Ms. Robinson's character and professional abilities.

224.    Lauder's interference caused the complete destruction of the relationship between NOMI and Lab Series, which canceled all planned business with NOMI.

## **DEMAND FOR RELIEF**

225.    Plaintiff hereby demands judgment as follows:

a.    Awarding Plaintiff general, compensatory, consequential, and/or restitutionary damages in an amount to be determined at trial for all injuries suffered as a result of Defendant's conduct, including Defendant's negligence;

b.    Awarding Plaintiff special, treble, and/or punitive damages in an amount to be determined at trial;

c.    Awarding Plaintiff pre-judgment and post-judgment interest at the maximum rate allowable by law;

d.    Enjoining Defendant from the use of NOMI's trade secrets and other proprietary information shared subject to a promise of confidentiality, including NOMI's system architecture in connection with Defendant's collection of first-person data to build consumer profiles, such as in connection with Defendant's Social Circle program in China and virtual consultations in the United Kingdom;

e.  Awarding Plaintiff the cost of suit incurred in this action and attorneys' fees; and

f.  All other relief that the Court deems warranted.

## DEMAND FOR JURY TRIAL

226.  Plaintiff hereby demands a trial by jury.


Dated: January 16, 2026                 Respectfully,

                                        BOIES SCHILLER FLEXNER LLP

                                        */s/ Craig Wenner*
                                        Matthew L. Schwartz
                                        Craig Wenner
                                        Kelly Waldo
                                        55 Hudson Yards
                                        New York, New York 10001
                                        Tel: (212) 446-2300
                                        mlschwartz@bsfllp.com
                                        cwenner@bsfllp.com
                                        kwaldo@bsfllp.com